## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LEONARDO CUSHENBERRY, #297345** | **CIVIL ACTION** |
| **VERSUS** | **NO.    20-1800** |
| **DARRYL VANNOY, WARDEN** | **SECTION: "M"(5)** |

### REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.    Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.    *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

*Procedural History*

Petitioner, Leonardo Cushenberry ("Cushenberry"), is a convicted inmate currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.    On August 1, 2012, Cushenberry was charged by bill of information with one count each of armed robbery, home invasion, and second-degree battery in violation of La. Rev. Stat. §§ 14:62.8, 14:64, and 14:34.1.[1]    After a two-day trial, on November 14, 2012, a jury found Cushenberry guilty as charged of home invasion and second-degree battery, and guilty of the responsive verdict of

---

[1] State Rec., Vol. 1 of 8, Bill of Information, 8/1/12.

attempted armed robbery.[2]    Cushenberry's post-conviction motion for a new trial and judgment of acquittal was denied.[3]    On January 9, 2013, Cushenberry was sentenced to 20 years to be served at hard labor for the home invasion conviction; 30 years at hard labor without benefit of parole, probation, or suspension of sentence for the attempted armed robbery conviction; and five years at hard labor without benefit of parole, probation, or suspension of sentence for the second-degree battery conviction, with the sentences to run concurrently.[4]    The State filed a multiple bill of information as to the attempted robbery conviction alleging Cushenberry was a fourth-felony offender.[5]    Cushenberry filed motions to reconsider sentence and for an appeal.[6]    On February 25, 2013, the trial court found Cushenberry guilty as a fourth felony offender and resentenced him to life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence.[7]

On direct appeal, Cushenberry's appointed counsel asserted that: (1) the trial court erred by denying his motion for mistrial based upon the State's untimely production of discovery material; (2) the trial court erred by denying his motion for mistrial based on the State's improper closing argument; (3) the evidence was insufficient to support his

---

[2]  State Rec., Vol. 1 of 8, Minute Entry, 11/13/12; Minute Entry, 11/14/12; State Rec., Vol. 6 of 8, Trial Transcript, 11/13-14/12; State Rec., Vol.2 of 8, Verdicts, 11/14/12.

[3]  State Rec., Vol. 3 of 8, Motion for New Trial and for Post Verdict Judgment of Acquittal, 1/3/13; State Rec., Vol. 5 of 8, Sentencing Transcript, 1/9/13.

[4]  State Rec., Vol. 1 of 8, Minute Entry, 1/9/13; State Rec., Vol. 5 of 8, Sentencing Transcript, 1/9/13.

[5]  State Rec., Vol. 1 of 8, Multiple Bill, 1/9/13; Minute Entry, 1/9/13; State Rec., Vol. 5 of 8, Sentencing Transcript, 1/9/13.

[6]  State Rec., Vol. 2 of 8, Motion to Reconsider Sentence, 1/9/13; Notice of Appeal, 1/10/13.

[7]  State Rec., Vol. 1 of 8, Minute Entry, 2/25/13; State Rec., Vol. 6 of 8, Sentencing Transcript, 2/25/13.

attempted armed robbery and home invasion convictions.[8]    On July 16, 2014, the Louisiana Fourth Circuit Court of Appeal affirmed his convictions on all three charges and his attempted armed robbery sentence.[9]    The court remanded the case to rule on petitioner's motion for reconsideration of sentence and to correct errors patent as to his battery and home invasion sentences, reserving the right for petitioner to appeal the sentences once the trial court had ruled on the motion to reconsider the sentences.[10]

On October 8, 2014, the trial court amended petitioner's sentence as to count one (home invasion) to reflect that the first five years were to be served without the benefit of probation, parole or suspension of sentence and sentenced Cushenberry to five years as to count three (second-degree battery) with credit for time served.[11]

Cushenberry filed a writ application with the Louisiana Supreme Court on August 11, 2014.[12]    On April 5, 2015, the Louisiana Supreme Court denied his application for a writ of certiorari, without reasons.[13]

On May 25, 2016, Cushenberry filed a pro se motion for out-of-time appeal alleging that his counsel failed to perfect an appeal of his new sentences as to two of his offenses.[14] On July 25, 2016, Cushenberry filed an application for writ of mandamus requesting the

---

[8]   State Rec., Vol. 6 of 8, Appeal Brief, 2013-KA-0382, 12/15/13.

[9]   *State v. Cushenberry*, No. 2013–KA–0382 (La. App. 4 Cir. 7/16/14), 146 So.3d 777; State Rec., Vol. 6 of 8.

[10]   *Id.*; State Rec., Vol. 6 of 8.

[11]   State Rec., Vol. 1 of 8, Minute Entry, 10/8/14.

[12]   State Rec., Vol. 8 of 8, La. S. Ct. Writ Application, 14 KO 1765 (signed 8/11/14).

[13]   *State v. Cushenberry,* No. 2014–KO–1765 (La. 2/4/11), 163 So.3d 791; State Rec. Vol. 8 of 8.

[14]   State Rec., Vol. 1 of 8, Motion for Out of Time Appeal, 5/25/16.

Louisiana Fourth Circuit direct the district court to set a hearing on his motion for out-of-time appeal.[15]    On that same date, he filed a second motion for out-of-time appeal requesting leave to appeal the amended sentences.[16]    On August 12, 2016, the Louisiana Fourth Circuit ordered the state district court to file a response to Cushenberry's writ application.[17]    On August 16, 2016, the state district court sent a letter to the Louisiana Fourth Circuit advising that it had contacted Cushenberry's previous counsel to set a date to address the motion to reconsider sentence and set an appeal date for the two sentences that remained appealable, and that it would keep the court informed of the hearing and the outcome.[18]

On September 29, 2016, the Louisiana Fourth Circuit issued an order directing the state district court to advise and update the court regarding the matter within 10 days.[19] On September 23, 2016, the trial court held a hearing, denied Cushenberry's motion to reconsider sentence, and noted in a minute entry that the ruling allowed him to appeal the amended sentences and the denial of the motion to reconsider sentence.[20]    On October 6, 2016, the state district court faxed the September 23, 2016 minute entry to the Louisiana Fourth Circuit as proof of compliance.[21]

---

[15]  State Rec., Vol. 7 of 8, 4th Cir. Application for Writ of Mandamus, 2016-K-0787, 7/25/16.

[16]  State Rec., Vol. 7 of 8, Motion for Out of Time Appeal, 7/25/16

[17]  State Rec., Vol. 7 of 8, 4th Cir. Order, 2016-K-0787, 8/12/16.

[18]  State Rec., Vol. 3 of 8, State District Court Letter, 8/16/16.

[19]  State Rec., Vol. 7 of 8, 4th Cir. Order, 2016-K-0787, 9/29/16.

[20]   State Rec., Vol. 1 of 8, Minute Entry, 9/23/16.

[21]  State Rec., Vol. 3 of 8, Fax, 10/6/16; State Rec., Vol. 1 of 8, Docket Master, Entry dated 10/6/16.

According to the State, "Neither the Fourth Circuit nor the Louisiana Supreme Court produced records in response to the State's records requests that would indicate that a second appeal was ever filed.    A Westlaw search likewise did not yield any results beyond the writ applications discussed in the Procedural History."[22]    However, the state district court Docket Master indicates a notice of appeal was sent to the Louisiana Fourth Circuit on November 30, 2016.[23]    Further, the Fourth Circuit Court of Appeal has confirmed Cushenberry filed an appeal in case number 2017-KA-0494.    Additionally, the state-court record filed by the State includes an order by the Louisiana Fourth Circuit granting his motion to dismiss that appeal.[24]    Also included is a letter from Cushenberry's appellate counsel informing him that the appeal had been dismissed on June 12, 2017, and that "the one-year AEDPA clock starts running in two weeks from that date, but to be on the safe side, I would consider the time to have started on June 12."[25]

The Louisiana Fourth Circuit has since provided the Court with an electronic copy of the record in case number 2017-KA-0494.[26]    According to a motion to dismiss appeal filed by Cushenberry's counsel June 9, 2017, and authorized by Cushenberry on March 6, 2017, Cushenberry conferred with counsel and determined pursing the appeal was not in his best interest.[27]    As indicated, the appeal was dismissed by the Louisiana Fourth Circuit on June

---

[22]  Rec. Doc. 15, p. 4. n. 17.

[23]  State Rec., Vol. 1 of 8, Docket Master, Entry dated 11/30/2016.

[24]  State Rec., Vol. 3 of 8, 4th Cir. Order, 2017-KA-0494, 1/12/17.

[25]  State Rec., Vol. 3 of 8, Letter to Cushenberry from Christopher A. Aberle, 6/16/17.

[26]  State Rec., Supp. Vol. 1 of 1.    By order dated January 4, 2022, the Court directed the Clerk of Court to print the electronic records and bind them as Supplemental Volume 1 of 1.    Rec. Doc. 23.

[27]  State Rec., Supp. Vol. 1 of 1, Motion to Dismiss Appeal, 2017-KA-0494, 6/9/17; Authorization to

12, 2017.[28]

In the interim, in May 2016, Cushenberry filed an application for post-conviction relief with the district court.[29]    On January 5, 2017, Cushenberry mailed a letter to the trial court stating that the application was "prematurely" filed and requesting to withdraw it.[30]

On August 6, 2017, Cushenberry filed an application for post-conviction relief with the trial court.[31]    In that application, he asserted (1) the court reporter violated his right to meaningful appellate review by withholding and altering the trial transcript, which also resulted in ineffective assistance of appellate counsel; (2) his trial and appellate counsel were ineffective for failing to review the transcript of the March 23, 2012 hearing and therefore failed to learn that the victim's door had been kicked in and would have resulted in a different theory of defense; (3) his trial counsel was ineffective for failing to interview witness Lawrence Davenport, failing to call witnesses Troy Davenport and Albert Earl to testify at trial, and counsel actively represented interests that conflicted with Cushenberry's own.    On April 13, 2018, Cushenberry filed a supplemental application for post-conviction

Dismiss the Appeal, 2017-KA-0494, 3/6/17.

    [28]  State Rec., Vol. 3 of 8, 4th Cir. Order, 2017-KA-0494, 6/12/17.

    [29]  State Rec., Vol. 2 of 8, Uniform Application for Post-Conviction Relief and Memorandum in Support of Application    Neither the application nor the supporting memorandum are dated or signed.    *Id.*    The application for post-conviction relief is not included on the Docket Master.    *See* State Rec., Vol. 1 of 8. Cushenberry later stated that he filed the application in May 2016.    *See* State Rec., Vol. 3 of 8, Letter to Trial Court, 1/5/2017.    The State also utilizes a May 2016 date.    *See* Rec. Doc., 15, p. 4.

    [30]  State Rec., Vol. 3 of 8, Letter to Trial Court, 1/5/2017.

    [31]  State Rec., Vol. 3 of 8, Uniform Application for Post-Conviction Relief and Memorandum in Support of Petition.    Federal *habeas* courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." *Causey v. Cain*, 450 F.3d 601, 607 (5th Cir. 2006).    The post-conviction application made a part of the state record is dated August 6, 2017.

relief wherein he added a claim that his trial and appellate counsel were ineffective for failing to protect Cushenberry's right to confront and cross-examine Assistant District Attorney Lisa Parker.[32]    On June 8, 2018, Cushenberry filed a motion to amend his application for post-conviction relief to construe his first and second claims as claims of prosecutorial misconduct, and his third claim to include ineffective assistance of counsel.[33]

The State filed procedural objections to petitioner's post-conviction application alleging that his claims of misconduct by the court reporter and prosecutors failed to alleged a claim that would entitled him to relief and were procedurally barred pursuant to La. Code Crim. art. 930.4(B) due to his failure to raise them on direct appeal.[34]    On November 18, 2018, the state district court sustained the State's procedural objections.[35]    The State filed a response on the merits to the remaining claims on December 20, 2018.[36]    Cushenberry filed another traverse on January 24, 2019.[37]    On February 8, 2019, the state district court denied the remaining claims on the merits finding that petitioner failed to prove his trial counsel was ineffective, and that Cushenberry's own statement placed him in the victim's apartment and established that he punched the victim in the face, which placed petitioner in

---

[32]  State Rec., Vol. 2 of 8, Supplemental Application for Post-Conviction Relief, 4/19/18 (signed 4/13/18).

[33]  State Rec., Vol. 2 of 8, Motion to Amend Original Application for Post-Conviction Relief, 6/13/18 (signed 6/8/18).

[34]  State Rec., Vol. 1 of 8, State's Procedural Objections to Defendant's Application for Post-Conviction Relief, 11/2/18.

[35]  State Rec., Vol. 1 of 8, Docket Master, Entry dated 11/20/2018.

[36]  State Rec., Vol.1 of 8, State's Response on the Merits & Incorporated Motion to Deny Defendant's *Pro Se* Application for Post Conviction Relief Pursuant to LA. C. CR. P. Art. 929, 12/20/18.

[37]  State Rec., Vol. 2 of 8, Petitioner's Rejoinder to the State's Response and Incorporated Motion(s) to Deny Petitioner's (pro se) Application for Post-Conviction Relief, 1/29/19.

the position of being a fourth-felony offender.[38]

On March 4, 2019, Cushenberry filed a writ application with the Louisiana Fourth Circuit Court of Appeal.[39]    On March 20, 2019, the Fourth Circuit denied Cushenberry's writ application without reasons.[40]

On April 26, 2016, Cushenberry filed a writ application with the Louisiana Supreme Court.[41]    On January 22, 2020, the Louisiana Supreme Court denied Cushenbery's writ application finding that he failed to show he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and failed to satisfy his post-conviction burden of proof as to his remaining claims, citing La. Code Crim. P. art. 930.2.[42]

On June 23, 2020, Cushenberry filed the instant application for *habeas corpus* relief.[43] In that application, Cushenberry claims: (1) in an attempt to hide improper conduct during trial, trial court officials maliciously altered the trial transcripts resulting in the denial of effective appellate counsel and an unfair appeal; (2) ineffective assistance of counsel based on *Brady* violations; (3) ineffective assistance of counsel as a result of failure to investigate, interview and subpoena witnesses for trial, and counsel's conflict of interest; (4) ineffective assistance of counsel resulting in the violation of his right to confrontation of witnesses.

---

[38]  State Rec., Vol. 1 of 8, State District Court Order denying post-conviction relief, 2/8/19.

[39]  State Rec., Vol. 7 of 8, 4th Cir. Writ Application, 2019-K-0205, 7/7/19 (received by Prison Legal Programs Department 3/4/19).

[40]  *State v. Cushenberry*, 2019-KW-0205 (La. App. 4 Cir. 3/29/19) (unpublished); State Rec., Vol. 7 of 8.

[41]  State Rec., Vol. 8 of 8, La. S. Ct. Writ Application, 19 KH 740, 4/26/19 (signed 4/24/19).

[42]   *State v. Cushenberry*, 2018–KH–0524 (La. 5/11/18), 287 So.3d 713; State Rec., Vol. 8 of 8.

[43]  Rec. Doc. 1, Petition under 28 U.S.C. § 2254 for Writ of *Habeas Corpus* by a Person in State Custody.

Cushenberry filed a memorandum of law in support of his petition on July 20, 2020.[44]

The State concedes that Cushenberry has exhausted his state-court remedies with respect to all of the claims, but argues that the application should be dismissed as untimely.[45] The State did not address the merits of any of the claims.    Cushenberry filed a traverse claiming he appealed his new sentences and that the time was tolled until the Louisiana Fourth Circuit Court of Appeal "affirmed" his sentences on June 12, 2017.[46]    For the following reasons, the Court rejects the State's argument that the federal petition is untimely and will therefore review the merits of the claims.

### Preliminary Review-Timeliness

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 et seq., governs the filing date for this action because Smith filed his *habeas* petition after the AEDPA's effective date.    *Lindh v. Murphy*, 521 U.S. 320, 117 S. Ct. 2059, 138 L.Ed.2d 481 (1997).    The AEDPA generally requires that a petitioner bring his Section 2254 claims within one year of the date on which his underlying criminal judgment becomes "final."[47]

---

[44] Rec. Doc. 7.

[45] Rec. Doc. 15.

[46] Rec. Doc. 18, pp. 2, 5.

[47] Title 28 U.S.C. § 2244(d) provides additional grounds, that do not apply here:

(1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

A.  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

B.  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

With regard to finality, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court. *Roberts v. Cockrell*, 319 F.3d 690, 693 (5th Cir. 2003). However, "[i]f the defendant stops the appeal process before that point," ... "the conviction becomes final when the time for seeking further direct review in the state court expires." *Id.* at 694; *see also Foreman v. Dretke*, 383 F.3d 336, 338 (5th Cir. 2004) (Section 2244(d)(1)(A) gives alternative routes for finalizing a conviction: either direct review is completed or the time to pursue direct review expires).
>
> Although federal, not state, law determines when a judgment is final for federal habeas purposes, a necessary part of the finality inquiry is determining whether the petitioner is still able to seek further direct review. *See Foreman*, 383 F.3d at 338–39. As a result, this court looks to state law in determining how long a prisoner has to file a direct appeal. *See Causey v. Cain*, 450 F.3d 601, 606 (5th Cir. 2006); *Roberts*, 319 F.3d at 693.

*Butler v. Cain*, 533 F.3d 314, 317 (5th Cir. 2008).

The State contends that Cushenberry's conviction became final on October 23, 2016,

the day his time for appealing his new sentences expired.[48]    Despite the State's argument

---

C.    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

D.    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

[48]    Rec. Doc. 15, p. 16 (citing See La. Code Crim P. art. 914).

to the contrary, it is clear that Cushenberry appealed his new sentences on two counts after he was given permission to file an out-of-time appeal. However, he moved to voluntarily dismiss the appeal, and the appeal was dismissed by the Louisiana Fourth Circuit on June 12, 2017. Louisiana law does not specifically address whether a judgment can be reviewed when it was the result of a voluntary dismissal of an appeal. However, under Louisiana law, the voluntary dismissal of a criminal appeal " 'has all the effect of an affirmance of the conviction and sentence.' " *State v. Perkins*, 2008-KA-0078 (La. App. 4 Cir. 2008), 988 So.2d 793, 799 (quoting *City of Shreveport v. Jones*, 172 La. 833, 135 So. 373, 374 (La. 1931)); *see also Watson-Buisson v. Cain*, No. 15-2361, 2015 WL 12434469, at *3 (E.D. La. Nov. 4, 2015), *report and recommendation adopted*, 2016 WL 4592182, at *4 (E.D. La. Sept. 1, 2016).

Under the Louisiana Supreme Court Rules, in the event that Cushenberry's conviction had been affirmed, he would have had 30 days to seek review from the state's highest court. La. Sup. Ct. Rule X, § 5(a); *see also Falkins v. Rader*, Civ. Action No. 13-3041, 2013 WL 5532620, at *4 (E.D. La. Oct. 4, 2013). Therefore, Cushenberry's conviction became final on Wednesday, July 12, 2017, thirty (30) days after the Louisiana Fourth Circuit dismissed his appeal. *Besse v. Tanner*, Civ. Action No. 16-2992, 2018 WL 9597496, at *4 (E.D. La. June 28, 2018), *report and recommendation adopted*, 2019 WL 4415242 (E.D. La. Sept. 16, 2019). Cushenberry then had one year, until July 12, 2018, by which to file his habeas corpus petition. However, Cushenberry did not file the instant federal *habeas* petition with this Court until June 23, 2020. Thus, his application must be dismissed as untimely unless the deadline was extended through tolling.

Regarding the tolling of the statute of limitations, the AEDPA expressly provides that "[t]he time during which a properly filed application for State post-conviction or other

collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."    28 U.S.C. § 2244(d)(2). Here, the state-court record shows that on August 6, 2017, Cushenberry filed his application for post-conviction relief thereby tolling the one-year federal limitations period after twenty-five (25) days.    His applications remained properly filed and pending with the state courts and his time continued to be tolled until January 22, 2020, when the Louisiana Supreme Court denied his application for supervisory writs.    Cushenberry had three-hundred forty (340) days remaining of the one-year limitations period at this point, or until December 28, 2020, in which to file his federal application.[49]    Cushenberry filed his habeas petition on June 23, 2020, well within the limitations period.    For this reason, the Court rejects the State's argument that the application should be dismissed as untimely.

*Facts*

The record facts as succinctly summarized by the Louisiana Fourth Circuit on direct appeal established the following:

> At trial, pursuant to the parties' stipulation, the state played a tape of the victim's 911 call that was received on 17 September 2011 at 7:22 a.m.
>
> Officer Byran Rice testified that on the morning of 17 September 2011, he was dispatched to Ochsner Baptist Hospital to meet with Marco Avila, who had sustained an injury to his eye.    After speaking with Mr. Avila, he determined that Mr. Avila had been injured at approximately 11:30 the night before at his apartment located at 9122 Dixon Street in New Orleans.    Officer Rice testified that Mr. Avila had a swollen left eye, with a broken orbital bone around his eye, and he appeared to be in pain.    Officer Rice stated that Mr. Avila identified

---

[49]    The final day fell on Sunday, December 27, 2020, causing the final day to fall on the next business day, Monday, December 28, 2020.    FED. R. CIV. PROC. 6(a)(1)(C) ("... if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.").

his attacker as "Cushenberry," whose nickname was "Two." The officer went to Mr. Avila's apartment and discovered that the door had been forced open; the dead bolt on the door was still engaged, and the door had been secured with a 2x4 that had been screwed into the molding, which had been ripped away from the wall. Officer Rice also noticed droplets of blood inside the apartment on the bed sheets and the floor. He found no contraband inside the apartment. He identified photographs of the apartment and of Mr. Avila that showed his injuries.

Officer Rice testified that when he was on patrol the next day in the neighborhood where Mr. Avila was attacked, he received a broadcast from Detective Ryan Vaught, who was the lead investigator of the attack on Mr. Avila. Detective Vaught radioed that he was in pursuit of Leonardo Cushenberry. Officer Rice saw Mr. Cushenberry emerge from between two houses on Hollygrove Street, but he was able to see Mr. Cushenberry only from the waist up because of a line of parked cars between them. Officer Rice stated that when Mr. Cushenberry saw him, he dropped his hands to his side. The officer exited his car and ordered Mr. Cushenberry to the ground. As Mr. Cushenberry complied, Detective Vaught arrived at the scene. As they both handcuffed Mr. Cushenberry, he stated: "That dude lied on me." Officer Rice stated that although they seized nothing from Mr. Cushenberry's person, they found a rusty black-handled fixed-blade knife near him. They then transported him to Central Lockup.

On cross-examination, Officer Rice testified that he and Detective Vaught called for crime lab personnel to go to Mr. Avila's apartment once they arrived there. He stated that the police did not seize a saw or a baseball bat, but he did not remember seeing either one of them at the apartment. After being shown a photograph of the inside of the apartment, Officer Rice testified that he did not direct anyone to try to take fingerprints from a sheetrock knife/saw that was lying on the floor of the apartment. He stated that although he directed crime lab personnel to try to get fingerprints from the door area, he did not ask them to swab for DNA material. He admitted that when the officers searched Mr. Cushenberry, they did not find any money, Mr. Avila's wallet, or any cocaine.

Dr. Eric Sundell, qualified by stipulation as an expert in emergency medicine, testified that he treated Mr. Avila at Ochsner Baptist Hospital's emergency room on 17 September 2011. Mr. Avila indicated that he had been punched in the face and had been rendered unconscious. Dr. Sundell described Mr. Avila's injuries as a swollen left eye with a cut around it. He stated that a CAT scan revealed a fractured bone to the orbit (eye socket), all around the bottom of the

left eye and in four areas of the eye wall, as well as a possible fracture of the septum.    He saw bleeding in the lining of Mr. Avila's eye.    He stated that Mr. Avila also had a concussion.    He opined that a person who sustains a broken bone typically feels pain.    He treated and released Mr. Avila that day, sending him home with prescriptions for antibiotics and painkillers.

On cross-examination, Dr. Sundell testified that his diagnosis of a concussion was based on Mr. Avila's statement that he was unconscious for a short time; the doctor indicated that no lab test would indicate a concussion.    He repaired a one-half centimeter cut to Mr. Avila's eye with medical super glue.    He stated that there was no mention of any alcohol consumption in Mr. Avila's medical records, which he identified.    On redirect, after reading the records, Dr. Sundell stated that there was no evidence of intoxication noted in the summary of the examination, the history provided by Mr. Avila, or the results of tests of his vital signs.    On re-cross, Dr. Sundell stated that evidence of cocaine use usually dissipates quickly, within one or two hours, in the body.

Marco Avila testified that he emigrated to the United States from Mexico in 1988.    He admitted that he had a DWI conviction in Houston from 1999 and a disturbing the peace conviction in New Orleans from 2006, which was based on his drinking in public.    He stated that in 2011, he lived in an apartment at 9122 Dixon Street and worked in construction.    On 16 September 2011, he performed demolition work in the morning and then received a paycheck.    He testified that his boss took him to cash his check, which was for $300, and then took him to the supermarket to buy some groceries.    While there, he also purchased a twelve-pack of beer.    Once home, he drank some of the beer while cooking, and then around 4:00 p.m. he left his apartment to go to his friends' house, taking some beers with him in a backpack as well as $20; he testified that he left the rest of his money at home.

Mr. Avila admitted that the house where he was going was a house where he and his friends smoked crack cocaine.    He estimated that in 2011, he normally smoked crack cocaine approximately once every two weeks, and he often saw Mr. Cushenberry at the house when he was there.    He stated that on this occasion, he left when he saw that Mr. Cushenberry, whom he did not consider to be a friend, was already there.    He stated that he returned home and drank more beer. At approximately 10:00 p.m. that night, after he had ingested a total of ten to twelve beers, he left his apartment again.    He stated that he ran into Mr. Cushenberry and another man, from whom he bought two little bags of crack cocaine for $20, the only money that he had with him.

He stated that Mr. Cushenberry asked him to give him one of the bags, but he refused and returned home.

Mr. Avila testified that because he did not have anything with which to smoke the cocaine, he planned to go to a friend's house to do so. Instead, he heard a knock on his door and heard Mr. Cushenberry call out, "Amigo," the name that Mr. Cushenberry called him. He stated that he told Mr. Cushenberry to go away and not to bother him. Instead, he then heard a loud noise, and when he turned around, he saw that Mr. Cushenberry had entered his apartment. He stated that Mr. Cushenberry punched him in the face. Mr. Cushenberry was also armed with a large knife. Mr. Avila testified that he fell to the floor, and Mr. Cushenberry told him to give him the drugs. He handed Mr. Cushenberry the cocaine that he had in his pocket. Mr. Cushenberry then asked him for money, and Mr. Avila pointed to money that was lying on the table. He stated that out of the $300 from his paycheck, he had spent money for groceries and for the crack cocaine, and he had one $100 bill and four $20 bills on the table. Mr. Cushenberry took the money and left.

Mr. Avila testified that after being hit in the head, it felt like his head was exploding; he had a lot of pain in his face. Mr. Avila went into the bathroom to wash his face, and it felt like he had broken bones in his face. He heard steps on the driveway, and he remembered that his roommate had a baseball bat in the living room by the door. He retrieved the bat and went to his bedroom, where he saw Mr. Cushenberry trying to push through the wall. Mr. Cushenberry left when he saw Mr. Avila with the baseball bat. Mr. Avila testified that because his cell phone had no remaining minutes, he stayed inside his apartment, watching the door, until daylight because he was afraid that Mr. Cushenberry was outside. He testified that at daybreak, he walked to a nearby gas station and called 911. An ambulance picked him up from the gas station and took him to the hospital.

Mr. Avila identified several photographs that the police had taken of his apartment, including one that showed the door through which Mr. Cushenberry had entered. He stated that he had sealed that door with a deadbolt and a 2x4 that he screwed into the door frame, and he could not open the door from the inside because of the 2x4. He realized that his money was missing from the table when he left to call the police. When police officers interviewed him at the hospital, he told them that Mr. Cushenberry broke into his house and punched him in the face; he did not tell them about the cocaine because he was ashamed and afraid that he would get into trouble. He viewed a photo lineup in the hospital from which he chose Mr. Cushenberry's photo, and he wrote on the back of the lineup photo: "He broke into my

room and punched me in the left eye, pulled a knife, and demanded for [sic] money." He stated that a detective returned the next day with a photo of a knife, which he identified as the knife that Mr. Cushenberry had during the robbery. Mr. Avila positively identified Mr. Cushenberry as the man who broke into his apartment, punched him in the eye, and stole his money and cocaine.

On cross-examination, Mr. Avila testified that although he drank ten beers that day, he did not have an opportunity to smoke the crack cocaine. He stated that he had known Mr. Cushenberry since he moved into the neighborhood in 2008, and he smoked crack cocaine with Mr. Cushenberry approximately five times; he did not recall telling an assistant district attorney that he smoked crack with Mr. Cushenberry ten to twelve times. He testified somewhat vaguely concerning an incident involving a bike in August 2009 wherein he and Mr. Cushenberry were arrested together.

Concerning his 911 call after the robbery, Mr. Avila testified that he did not remember telling the 911 operator that $300 was stolen, but he remembered saying that his wallet and paycheck were taken. He stated that the 911 operator did not ask him who robbed him, but he gave this information to Detective Vaught. He stated that he also told the detective that Mr. Cushenberry took $180, returned to the apartment, and tried to enter a second time. At that time he armed himself with the baseball bat. He admitted that he did not tell the prosecution about the cocaine until later. He stated that although no charges were pending against him at the time of trial, the prosecutors told him that he might face charges.

On re-direct, Mr. Avila admitted that he bought crack cocaine that day. He stated that at the time of the offense he did not know Mr. Cushenberry's first name. He denied swinging a sheetrock saw at Mr. Cushenberry during the attack.

Detective Ryan Vaught was the detective in charge of the investigation. He met with Mr. Avila at the hospital on the day after the robbery. He testified that Mr. Avila's eye was red, bleeding, and swollen. Mr. Avila related what happened and identified his attacker as "Cushenberry," whose nickname was "Two." Mr. Avila told him that he knew his attacker from the neighborhood. Detective Vaught relayed this information to another officer, who compiled a lineup that contained Mr. Cushenberry's photo. Mr. Avila viewed the lineup and identified Mr. Cushenberry's photo as that of his attacker. After this identification, the detective went to Mr. Avila's apartment. He found the door ajar, and it appeared to have been forced open. He found blood on the floor, the bed, and the sheets. He identified various

photographs, including one that he indicated showed a kick mark at the bottom of the door.    He also identified another photo that showed the interior of the door frame with screws and nails that had secured the door to the wall.    Another photograph showed the door jamb, which was cracked where the dead bolt and latch would normally rest.    Yet other photographs showed that the door had been forced in and that a 2x4 had been nailed across the back of the door.    He stated that they found no contraband or drug paraphernalia in the apartment.

Detective Vaught testified that he obtained an arrest warrant for Mr. Cushenberry, and the next day he went to the Hollygrove area to see if he could locate him.    He noticed Mr. Cushenberry standing at the corner of Hollygrove and Peach Streets, and when Mr. Cushenberry saw the detective, he ducked behind a stack of wooden pallets. Detective Vaught stopped his car and shouted to Mr. Cushenberry, who ran.    He broadcast his description and asked for backup.    He stated that he began running toward where he thought Mr. Cushenberry was headed, and another officer radioed that he saw him emerge from between two houses.    Detective Vaught heard yelling and followed the sound to where he saw Officer Rice and Mr. Cushenberry, who was on the ground.    As the officers handcuffed him, Mr. Cushenberry stated that the other man lied on him.    After Mr. Cushenberry was handcuffed, the detective informed Mr. Cushenberry that he was under arrest for armed robbery.    After putting Mr. Cushenberry in the back of a police unit, the officers found a fixed-blade, black-handled knife inches from where he was apprehended.

Detective Vaught testified that he took Mr. Cushenberry to the police station, where he formally advised him of his *Miranda* rights. After indicating that he understood his rights and signing and initialing a waiver of rights form, Mr. Cushenberry gave a recorded statement, which was played for the jury.

In his statement, Mr. Cushenberry explained that his statement at his arrest, that the "dude lied on him," referred to someone he called "Migo,"[2] who lived in the neighborhood.    He insisted that the incident was merely a drug deal "gone bad," and he maintained that the whole neighborhood knew the truth about the incident.    He stated that Migo had sent someone to get crack for him, but that person did not return. Mr. Cushenberry stated that he was at the house of Paul and Tommy, who live on Marks Street, and Migo came up and told Tommy that he wanted to buy some crack cocaine.    Mr. Cushenberry stated that Migo indicated that he had only a $100 bill and needed to get change.    Mr. Cushenberry told Migo that he would find someone who would sell him cocaine.    After Migo got change for the $100 bill, the two men ran into someone named Dave, who sold Migo crack cocaine.    Instead of

returning to Paul and Tommy's house, Migo took the cocaine back to his apartment.

[2]We note the similarity between "Amigo," the name that Mr. Avila said he was called by the defendant, and the name "Migo."

Mr. Cushenberry told Detective Vaught that he went to Migo's apartment and knocked on his door.    Migo told him to get away from the door, and then Migo opened the door and came outside.    Mr. Cushenberry stated that all he wanted to do was get some cocaine from Migo to get high.    Instead, Migo began talking "crazy," and Mr. Cushenberry lost his temper and punched Migo, who then fell through the door, taking Mr. Cushenberry with him.    He insisted that they were outside the apartment when he hit Migo, and he only hit Migo with his fist.    He denied taking Migo's money or pulling a knife.    He stated that Migo lost his money through smoking cocaine with a woman named Troy; he did not know if Troy was a prostitute, but he invited the detective to ask Tommy and Paul about her.    He described Tommy and Paul as the only "white" guys at the corner of Marks and Hollygrove Streets.    He denied that Tommy and Paul sold drugs, but they sometimes got high.    Mr. Cushenberry stated that he went back to their house after he punched Migo and told them what happened. He told the detective that although he punched Migo sometime between 10:00 and 11:00 p.m., Migo probably did not contact the police until "God knows when."

In the statement, Detective Vaught asked Mr. Cushenberry why he ran when he saw the detective, and Mr. Cushenberry replied that he was not ready to go to jail.    When Detective Vaught told him that he would be "taking the ride today for armed robbery," he replied:

> "Man, I'm in a world of trouble.    It's going to look like it too.    I understand that but I'm not that stupid to actually rob that man at knife point and just kick in the door or something.    Ain't no telling what Migo' did?    I know he did hit the door when I hit him, I fell too.    But the whole door [sic] off the hinges.    I don't know what he did. He was in there all night smoking crack."

Mr. Cushenberry then asked if anyone had gotten a reward for his capture, but Detective Vaught responded that he was the one who found him, and he could not get a reward.    Mr. Cushenberry then told the detective that no one from the neighborhood called because they all knew that the charges were false.

After playing the recording of Mr. Cushenberry's statement, the

state resumed its examination of Detective Vaught.    He indicated that Mr. Cushenberry's statement was not consistent with the condition of the broken door at Mr. Avila's apartment, in that the door had been secured with the 2x4 inside the doorjamb.    Detective Vaught denied knowing about any Crimestopper tip or news release concerning the robbery.    He stated that after seizing the knife at Mr. Cushenberry's arrest, he showed a photo of it to Mr. Avila, who identified it as the knife that Mr. Cushenberry brandished during the attack.

On cross-examination, Detective Vaught admitted that he did not know what Mr. Avila did between the time of the attack and when he called the police.    He stated that Mr. Avila told the detective that he and his assailant had been in jail together.    Mr. Avila mentioned nothing about cocaine or using it with Mr. Cushenberry in the past. The detective admitted that there was no indication in his report about Mr. Cushenberry leaving and then returning to Mr. Avila's apartment, but he stated that this information was in Officer Rice's report.    He stated that Mr. Avila told him that Mr. Cushenberry took the money out of his pocket, not off of the dresser or the table.    He stated that Mr. Avila told him that Mr. Cushenberry stole $180, not $300; he mentioned nothing about a paycheck or his wallet.    He also was unsure if Mr. Avila told him that he had consumed twelve beers or was intoxicated. Detective Vaught stated that he was unaware that the police department published a news release about the robbery on the afternoon after it occurred, and he stated that officers are not told if Crimestoppers offers a reward for information concerning a case.    He stated that he did not remember Mr. Cushenberry telling him that Mr. Avila "got up in his face" before he hit Mr. Avila;[3] he stated that Mr. Cushenberry said that Mr. Avila cursed at him.    Detective Vaught testified that he spoke to neither Tommy nor Paul, nor did he find a woman named Troy.    He stated that he did not listen to the 911 call. He admitted that there was no evidence that Mr. Cushenberry used the knife on Mr. Avila.    He did not direct crime lab personnel to seize the sheetrock saw that was on Mr. Avila's floor because it was one of the tools that Mr. Avila used in his work.    When he was shown Officer Rice's report, he agreed that it did not contain any mention of Mr. Avila giving the denominations of the money taken from him, and he stated that this information must have been in Officer Rice's initial report.

[3]We find no reference to this in Mr. Cushenberry's statement.

On redirect, Detective Vaught identified Officer Rice's initial report, which set forth the denominations of currency taken from him. The narrative of that report also mentioned that Mr. Cushenberry returned to Mr. Avila's apartment, Mr. Avila armed himself with a baseball bat, and Mr. Cushenberry then left.    Detective Vaught agreed that Mr. Cushenberry neither mentioned in his statement that Mr. Avila attacked him with the sheetrock saw, nor indicated that Mr. Avila came

out of the house, screaming that three is a crowd.    Detective Vaught testified that he did not know if Troy was a prostitute.

The state recalled Officer Rice, and over defense objection, he testified that Mr. Avila told him that when Mr. Cushenberry returned, he armed himself with a baseball bat, and Mr. Cushenberry ran away.

At this point, the jury retired for lunch, whereupon considerable argument concerning alleged discovery violations by the state occurred, which comprises one of the assignments of error raised in this appeal.

Once the jury returned, the state called Deputy Don Hancock, a telephone supervisor for the Orleans Parish Sheriff's Office.    Deputy Hancock described the method by which inmate calls are made and recorded, including the fact that each inmate must give his folder number as a pin number for making calls.    He testified that he compiled a CD of two calls placed by Mr. Cushenberry, one on 18 September 2011 when he was booked into Central Lockup, and one on 1 October 2011.    The state then played the recording of the two calls. In the first recording, the person to whom Mr. Cushenberry made his call (possibly Paul) asked him if he wanted him to talk with "this guy" (meaning the victim), and then the man stated that he was going to call "a guy" he knew to see if that person could get the victim to retract and recant his statement.    In the second one, Mr. Cushenberry told a person on the line to go to someone's house and get something from behind the sheetrock because he could not use it.    He then told another person that if he ran into "Migo," he should see what was happening with him.

The state rested, and the defense called no witnesses and rested.[50]

*Standards of Review on the Merits*

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure questions of fact, pure questions of law, and mixed questions of both.    A state court's purely

---

[50]    *State v. Cushenberry*, 2013-0382 (La. App. 4 Cir. 7/16/14), 146 So. 3d 777, 780-786; State Rec., Vol. 6 of 8.

factual determinations are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."    28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court, a determination of a factual issue made by a State court shall be presumed to be correct.    The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").    With respect to a state court's determination of pure questions of law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The " 'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."    *Bell v. Cone*, 535 U.S. 685, 694 (2002).    A state-court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent.    *Williams v. Taylor*, 529 U.S. 362, 405B06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010).    An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule ... but unreasonably applies it to the facts of the particular state prisoner's case."    *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 134 S.Ct.

1697, 1706 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694. A state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief. *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Section 2254(d) preserves authority to issue the writ in cases where there is "no possibility fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents." *Id.* (emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

The AEDPA's deferential standard of review under Section 2254(d) and *Williams*, 529 U.S. at 362, applies only to claims adjudicated on the merits by the state courts. 28 U.S.C. § 2254(d). With respect to claims that are not fully adjudicated on the merits in state court, the deferential AEDPA standards of review do not apply. *Cullen v. Pinholster*, 563 U.S. 170, 185-86 (2011); Henderson v. Cockrell, 333 F.3d 592, 597 (5th Cir. 2003). Instead, the federal courts review those claims under pre-AEDPA de novo standards of review. *Id.* at 598 (citing *Jones v. Jones*, 163 F.3d 285, 299-300 (5th Cir. 1998) (applying de novo standard of review to ineffective assistance of counsel claims that were raised in state court, but not adjudicated on the merits)); *Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009).

*Analysis*

## A.    Denial of the a Right to a Meaningful Appeal

Cushenberry's first claim is that he was denied the right to a meaningful appeal and effective assistance of appellate counsel[51] due to trial court officials maliciously altering transcripts in an attempt to hide improper conduct.    He contends that Avila was recalled to testify as the last witness in the State's case, but that the entirety of his testimony has been omitted from the trial transcript.    He further claims that the prosecution played jailhouse phone calls referencing Cushenberry threatening Avila in an attempt to prevent him from testifying at trial, which were also omitted from the trial transcript.

In his application for post-conviction relief, Cushenberry claimed that the following examination and testimony occurred, which he alleges occurred after the jail phone calls were played, and was not included in the trial transcripts[52]:

Napoli:    Mr. Avila where was your money located when Cushenberry took it from you

Avila:    um…my money was on the table…no it was in my pocket, no no it was on the table

Napoli:    Marco are you sure your money was on the table

Avila:    No…it was on the table yes

Napoli:    Cushenberry came back to your apartment a second time during the night, and you chase him away with your baseball bat why did you wait until morning to call the police

Avila:    I could not call…um I was afraid

---

[51]  The Court will address Cushenberry's call of ineffective assistance of appellate counsel separately.

[52]  The Court uses Cushenberry's verbatim transcription, which includes a lack of punctuation and capitalization in many instances as well as misspelled words.

Napoli:        Marco when you called 911 didn't you tell the operator Cushenberry's name

Avila:        Um…I was know good to speak…I could talk …shit I don't know

Napoli:        ladies and gentlemen Marco Avila is a hostile witness, he is trying to help Mr. Cushenberry and I will show you why…

At that moment Mr. Napoli played jailhouse phone call (taped conversation #2) for the jury L. Cushenberry = Too & party is Rashawn Hall = GB

GB:        hey Too what's up, man its going down out here

LC:        yeah it sounds like y'all are having fun

GB:        yeah, you ain't here, man you couldn't wait, you couldn't be patient

LC:        GB, man Migo is lying, I didn't rob him

GB:        yeah

LC:        yeah

GB:        well what do you need me to do

LC:        hu!

GB:        what do you need me to do

LC:        um…go holla at Migo…just go holla at Migo for me

At this moment, Mr. Napoli stops the tape and states to the jury, "there Cushenberry is, using people on the streets to threaten this witness it is why Marco Avila is not cooperating" I have no further questions."

The Court:    cross

Counsel:    yes your honor one question…Marco did anyone threaten you

Avila:        um…know one

Counsel:    Marco did anyone at any time threaten you during this

24

trial

Avila:        um…they did (pointing at prosecutor table) they say they lock me up if I don't come here today

Napoli:       you damn right I did and you better sit there and do what you suppose to

The Court:    bang, bang, "order in the court" bang bang "order in the court"[53]

The state district court, in addressing Cushenberry's application for post-conviction relief, stated: "This Court has not only reviewed this entire record and trial transcript, but listened to the trial tapes in order to hear the victim's testimony and the entirety of the opening statements and closing arguments, which are not generally transcribed except for objections."[54]    When addressing the excerpts he alleged were intentionally omitted from the record, the state district court stated, "This court does not understand how the defendant was able to produce the excerpts if they were intentionally omitted from the record."[55] Notably, the state district court found that the jail house calls, which consisted of State Exhibits 15 and 16, were played during the testimony of Don Hancock.[56]    The Louisiana Supreme Court found he had not met his burden under La. Code Crim P. art. 930.2

It is indisputably true that a criminal defendant has the right to adequate appellate and other review of his conviction based upon a sufficiently complete and accurate record.

---

[53]  State Rec., Vol. 3 of 8, Memorandum in Support of Application for Post Conviction relief, pp. 4-5, 8/6/17.

[54]  State Rec., Vol 1 of 8, State District Court's Order on Application for Post-Conviction Relief, p. 1, 2/8/19.

[55]  *Id.*, at p. 2.

[56]  *Id.*

*Mayer v. City of Chicago*, 404 U.S. 189, 198, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971).    However, the Supreme Court has not held that due process requires a verbatim transcript of the entire proceedings or that an incomplete record confers automatic entitlement to relief.    In any event, to prevail on a claim that the record was inadequate, a petitioner must prove that he was actually prejudiced in his appeal because a portion of the transcript was missing. *Green v. Johnson*, 160 F.3d 1029, 1045 (5th Cir. 1998) ("[B]arring a showing that the [failure to record bench conferences during trial] resulted in 'actual prejudice,' habeas relief is unwarranted." (citation omitted)); *see also Mullen v. Blackburn*, 808 F.2d 1143, 1146 (5th Cir. 1987) (finding petitioner failed to show the absence of voir dire transcript prejudiced his appeal); *Bozeman v. Cain*, Civ. Action No. 09-8423, 2010 WL 2977393, at *4 (E.D. La. June 7, 2010), *report and recommendation adopted*, 2010 WL 2977402 (E.D. La. July 20, 2010) (finding that petitioner's claim failed when there was no actual prejudice resulting from the failure to transcribe a bench conference).

Cushenberry's claim that the foregoing examination of Avila took place and was purposely omitted from the record is completely unfounded.    The minute entry indicates that Deputy Don Hancock was the fifth and final witness for the prosecution.[57]    There is absolutely no indication in the minutes that Avila, who was the third state witness to testify, was recalled by the State after the conclusion of Hancock's testimony.    Further, the transcript includes a certificate from the court reporter who certified that the testimony was reported by her in the stenotype reporting method, was prepared and transcribed under her

---

[57]    State Rec., Vol. 1 of 8, Minute Entry, 11/14/12.

supervision, and is a true and correct transcript.[58]   Further, contrary to his claim, there is

no mention in the motion for new trial and for post-verdict judgment of acquittal that the

prosecution told the jury that Cushenberry threatened Avila to prevent him from testifying

at trial.[59]   The Louisiana Fourth Circuit detailed the phone calls and neither indicated that

Cushenberry threatened the victim.   Rather, during the first call, the person to whom

Cushenberry was speaking said "he was going to call 'a guy' he knew to see if that person

could get the victim to retract and recant his statement."[60]   During the second call,

Cushenberry "told another person that if he ran into 'Migo,' he should see what was

happening with him."[61]   Neither calls suggests that Cushenberry was attempting to

threaten Avila.

Cushenberry has not provided any competent evidence that there were alterations to

the transcripts.   In the absence of any evidence that the transcripts were altered, the state

courts' denial of relief was not contrary to or an unreasonable application of law as

established by the United States Supreme Court.   Cushenberry is not entitled to relief as to

this claim.

## B.   Ineffective Assistance of Counsel (Claim One (in part), Claims Two, Three and Four)

Intertwined with the claim one, Cushenberry asserts that he was denied effective

assistance of appellate counsel due to the omitted excerpt of the trial transcript.   In claim

---

[58] State Rec., Vol. 6 of 8, Trial Transcript, p. 297, 11/13-14/13.

[59] Rec., Doc. 7, p. 20; State Rec. Vol. 3 of 8, Motion for New Trial and For Post-Verdict Judgment of Acquittal, 1/3/13; State Rec., Vol. 5 of 8, Sentencing Transcript, 1/9/13.

[60] *Cushenberry*, 2013–KA–0382(La. 4 Cir. 2014), 146 So. 3d at 786; State Rec., Vol. 6 of 8.

[61] *Id.*; State Rec., Vol. 6 of 8.

two, he contends he was denied effective assistance of trial and appellate counsel as a result of *Brady* violations.    In claim three, he claims his counsel was ineffective in failing to investigate the case, interview and subpoena witnesses, and presented a different theory of defense.    He also claims his counsel represented "conflicting interests."    Finally, in claim four, he contends his counsel was ineffective in failing to call ADA Parker to testify about the inconsistencies in the statement she took from Avila.[62]

The state district court rejected Cushenberry's claims that his trial and appellate counsel rendered ineffective assistance raised in his application for post-conviction relief.[63] The Louisiana Fourth Circuit Court of Appeal denied Cushenberry's related writ application.[64]    In the last reasoned opinion, the Louisiana Supreme Court denied writs, finding "[a]pplicant fails to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984)."[65]

1.    *Effective Assistance of Trial Counsel*

The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel.    Specifically, a petitioner seeking relief must demonstrate both deficient performance by counsel and that the deficient performance prejudiced his defense.    *Strickland*, 466 U.S. at 697.    A petitioner bears the burden of

---

[62]    Cushenberry initially framed this claim as a substantive one, that is, that he was denied the right to confront Assistant District Attorney Lisa Parker, who interviewed Avila.    Rec. Doc. 1, p. 10; Rec. Doc. 7, pp. 46-51.    However, in his traverse, Cushenberry clarified that his fourth claim is one of denial of effective assistance of counsel.    Rec. Doc. 18, p. 18.

[63]    State Rec., Vol. 1 of 8, State District Court Order denying post-conviction relief, 2/8/19.

[64]    *State of Louisiana v. Cushenberry*, No. 2019-K--0205 (La. App. 4 Cir. 3/29/19 (unpublished); State Rec., Vol.7 of 8.

[65]    *State v. Cushenberry*, 19-KH-0740 (La. 1/22/20), 287 So.3d 713 (per curiam); State Rec, Vol. 8 of 8.

proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."    *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000).    If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, *i.e.,* deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.    *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.    *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998).    Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689; *Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009)..    "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.' "    *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690).    A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.    *See Harrington*, 562 U.S. at 104 (*citing Strickland*, 466 U.S. at 689).

To prevail on the prejudice prong of the *Strickland* test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."    *Strickland*, 466 U.S. at 694; *see also Williams v. Thaler*, 602 F.3d 291, 310 (5th Cir. 2010).    Furthermore, "[t]he petitioner must 'affirmatively prove,' and not just allege, prejudice."    *Day v. Quarterman*, 566 F.3d 527, 536

(5th Cir. 2009) (quoting *Strickland*, 466 U.S. at 695).    In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."    *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Strickland*, 466 U.S. at. 694).

The Supreme Court has held that the two-prong test articulated in *Strickland* applies to ineffective assistance claims in the guilty plea context.    *Hill v. Lockhart*, 474 U.S. 52, 57-59 (1985).    To establish deficient performance, a petitioner must show "that counsel's representation fell below an objective standard of reasonableness."    *Id.* at 57.    "Judicial scrutiny of counsel's performance must be highly deferential," and the petitioner bears a heavy burden in overcoming "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and might be considered sound trial strategy.    *Strickland*, 466 U.S. at 689 (citation and internal quotation marks omitted).    To satisfy the prejudice prong in the guilty plea context, a petitioner must show "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."    *Hill*, 474 U.S. at 59.

On habeas review, the United States Supreme Court has clarified that, in applying *Strickland*, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom."    *Harrington*, 562 U.S at 105.    The *Harrington* Court went on to recognize the high level of deference owed to a state court's findings under *Strickland* in light of AEDPA standards of review:

> The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.    The *Strickland* standard is a general one, so the range of reasonable applications is substantial.    Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).    When § 2254(d) applies, the question is not whether counsel's

actions were reasonable.    The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (citations and quotation marks omitted).

Accordingly, scrutiny of counsel's performance under § 2254(d) is "doubly deferential." *Cullen*, 563 U.S. 190 (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1413 (2009) ).    The federal courts must look at counsel's performance under the *Strickland* standard through the "deferential lens of § 2254(d)." *Id.* (citing *Strickland*, 466 U.S. at 689 and quoting *Knowles*, 129 S.Ct. at 1419 n. 2).    Furthermore, the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." *Moore v. Johnson*, 194 F.3d 586, 591 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 689–90); *see also Matheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

Because the state courts rejected Cushenberry's ineffective assistance of counsel claims on the merits and because such claims present a mixed question of law and fact, this Court must defer to the state-court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002).    In fact, the United States Supreme Court has held that, under the AEDPA, federal habeas corpus review of ineffective assistance of counsel claims must be "doubly deferential" in order to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. at 190).

a.    *Claim Two – Late Disclosure of Brady Information*

Cushenberry claims that *Brady* material, specifically a photograph showing a 2x4 with

steel brackets that was attached to Avila's door to prevent the door from being opened and a police report by Detective Rice mentioning the 2x4 and other information, were suppressed by the prosecutors.    He contends that the suppression of this evidence resulted in his counsels' refusal to defend the issue of forced entry.    He claims counsel abandoned their duties to change the defense strategy and impeach the victim's testimony.

At a hearing on March 23, 2012, Detective Vaught testified that a wooden-style door with a 2x4 behind it had been pushed in and the 2x4 had been pulled away from the sheetrock that it had been secured to.[66]    He could not recall if there were any footprints on the door.[67]    Cushenberry himself told the state district court that he was missing items from his discovery packet including pictures of the door.[68]    The court directed counsel to provide Cushenberry with a fresh discovery packet.[69]    Counsel was allowed to withdraw from the case after the hearing and the Indigent Defender's Office was appointed to represent Cushenberry.[70]    Cushenberry admits that his original counsel withdrew because "he accused her of 'wrongfully' working for the prosecution."[71]

Trial counsel filed a new request for discovery.[72]    Defense counsel filed a motion to

---

[66]  State Rec., Vol. 6 of 8, Hearing Transcript, pp. 12-13, 3/23/12.

[67]  *Id.*, at p. 13.

[68]  *Id.*, at p. 17

[69]  *Id.*, at p. 18.

[70]  *Id.*, at p. 18-20.

[71]  Rec. Doc. 18, p. 21.

[72]  State Rec., Vol. 2 of 8, Omnibus Motion for Discovery, Motion for Suppression of Statements, Evidence and Identification; and Motions for a Preliminary Examination, 8/14/12; Inventory of Discovery Received Mandated by the Louisiana Code of Criminal Procedure, 11/5/12.

exclude the photographs for failure to comply with discovery on November 13, 2012.[73]

Immediately before jury selection, counsel argued the motion relating to photographs, which

were turned over to the defense by the prosecution 20 hours earlier.[74]    The State agreed

that it planned to use in its case-in-chief only one of the recently turned over photographs

which depicted the "breaking" of the door.[75]    The state district court found that, "Although

this photograph more clearly depicts the 'breaking' quote of a door, the court believes that

there is no undue prejudice or surprise to the defense because the defense had at least four

other photographs that showed the door was broken although not as clearly as this

photograph."[76]    Defense counsel argued that it was a different photograph depicting a

different angle and showed something "very different," however, the court overruled the

objection and denied the motion.[77]    When the picture was admitted into evidence,

defense's objection was noted.[78]

At trial, Detective Vaught testified that he did not include in his report that Avila told

him Cushenberry returned to his home a second time or that he used a bat to scare him off.[79]

He explained that the information was covered in Detective Rice's first report.[80]    When he

---

[73]    State Rec., Vol. 4 of 8, Motion to Exclude Evidence under Louisiana Code of Criminal Procedure Article 729.5 – Failure to Comply, 11/13/12

[74]    State Rec., Vol. 6 of 8, Trial Transcript, pp. 23-26, 11/13-14/12.

[75]    *Id.*, at pp. 24-25.

[76]    *Id.*, at p. 25.

[77]    *Id.*, at pp 25-26.

[78]    *Id.* at p. 83

[79]    *Id.*, at pp. 197-98.

[80]    *Id.*

was shown a report by Detective Rice, Detective Vaught explained that the report was the supplemental report and that he needed to review Rice's initial report.[81]    The prosecution reviewed the initial report with Vaught on re-direct.[82]

Outside the presence of the jury, defense counsel argued that they were unaware of Detective Rice's initial report until Detective Vaught's testimony, and that the report had not been disclosed during discovery.[83]    Defense counsel reviewed with the court what information they claimed was new and prejudicial to the defense, including Avila's consumption of alcohol, that Avila heard a knock at his door, that his door was secured by a wooden 2x4, and that Cushenberry's blow to Avila caused him to fall back into a chair rendering him dazed and slightly conscious, and moved for a mistrial.[84]    The court denied the request for mistrial, finding that the defense was not unduly prejudiced, as it was aware of most of the information through previous discovery.[85]

The court provided counsel with the opportunity to decide whether it wanted the entire report read into evidence or to recall Officer Rice.[86]    Defense counsel once again moved for a mistrial, for reasons placed under seal, and the court again denied the motion.[87]

---

[81]  *Id.*, at p. 222.

[82]  *Id.*, at pp. 224-26.

[83]  *Id.*, p. 239.

[84]  *Id.*, at pp. 240-47.

[85]  *Id.*, at p. 241, 244-47.

[86]  *Id.*, at p. 250.

[87]  *Id.*, at pp. 253-54, 284.    While the record does not include the argument under seal, according to the Louisiana Fourth Circuit, "In the in camera argument, counsel merely reiterated her argument that she would have cross-examined Mr. Avila about the 2x4, but the court again noted that counsel obtained the photo prior to cross-examination."    *Cushenberry*, 2013–KA–0382 (La. App. 4 Cir. 7/16/14), 146 So.3d 777, at 791 n.

The defense generally has the right to be provided evidence that is favorable to the defense and copies of any witness statements that relate to the subject matter of the witness's statement.    The Supreme Court in *Brady* required the production of the exculpatory and impeachment evidence for reasons of due process and a violation thereof is reviewable on federal habeas review.    *Brady v. Maryland*, 373 U.S. 83, 87 (1963). However, the failure to produce witness testimony is not of constitutional magnitude. *Martin v. Maggio*, 711 F.2d 1273, 1283 (5th Cir.1983); *Calley v. Callaway*, 519 F.2d 184, 225–26 (5th Cir.1975).

Further, the *Brady* disclosure requirement applies only to exculpatory and impeachment evidence, not to inculpatory or neutral evidence.    *See United States v. Nixon*, 881 F.2d 1305, 1308 (5th Cir.1989); *see also Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir.1994); *Andrews v. Collins*, 21 F.3d 612, 626 (5th Cir.1994).    "If the evidence is inculpatory, then *Brady* is not violated, regardless of the effect at trial of the nondisclosure." *United States v. Gonzales*, 90 F.3d 1363, 1369 (8th Cir.1996).    Thus, only evidence that is exculpatory and material to guilt or that is favorable impeachment evidence must be disclosed by the prosecution for due process reasons.    *Strickler v. Greene*, 527 U.S. 263, 282 (1999); *Brady*, 373 U.S. at 87.

Significant to this case is the proposition that claims pursuant to *Brady* involve " 'the discovery of evidence *after* trial of information which had been known to the prosecution but unknown to the defense.' "    *Lawrence*, 42 F.3d at 257 (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)) (emphasis added).    Such is not the case here.    There is no

---

6; State Rec. Vol. 6 of 8.

dispute that defense counsel was given the photograph prior to trial. As for Detective Rice's report, defense counsel was provided with the report during trial and given the opportunity to recall the State's witnesses or to have the report read into evidence. The defense chose neither option. "[W]hen information is fully available to a defendant at the time of trial ... the defendant has no *Brady* claim." *United States v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980).

While defense counsel was aware prior to trial of the 2x4 and the damage to the door, counsel obviously made a strategic choice not to question Avila about it, and instead to use Cushenberry's claim that the argument occurred outside. Cushenberry has not demonstrated that the outcome of the trial would have been any different but for counsel's decision not to question Avila about the door. Avila consistently reported to 911, detectives, and testified at trial that Avila broke into his room, struck him, and robbed him. There is no reason to believe that Avila would have testified differently had defense counsel questioned him about the 2x4. Rather, it would have likely resulted in more testimony by Avila that Cushenberry kicked in his door. Defense counsel attempted to impeach Avila's credibility by questioning him about the amount of alcohol he had consumed prior to the incident, how often his smoked cocaine, the inconsistencies in his trial testimony versus the information he gave ADA Parker and Detective Vaught during his initial interviews, and that fact that he was not prosecuted for the cocaine related to the incident.[88]

Defense counsel also questioned Rice about Cushenberry's door and he admitted that

---

[88] *Id.*, at pp. 147-162.

he did not personally witness anyone force the door open.[89]    Detective Rice also admitted on cross-examination that he did not ask for fingerprints to be taken from the scene.[90] While defense counsel chose not to have Rice's report read into evidence, the report would have simply supported the prosecution's case.

For these reasons, Cushenberry has not demonstrated that the state court's decision rejecting this ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law.

b.    *Claim Three -Failure to Investigate, Call Witnesses, Formulate a Defense & Conflict of Interest*

Cushenberry claims his counsel failed to independently investigate the case.    He specifically claims his counsel failed to discover that Vaught planted the knife at the scene of his arrest for Rice to discover.    He also claims that his counsel failed to interview Albert Earl, Lawrence Davenport, and Troy Davenport and call them to testify at trial.    He additionally claims his counsel failed to present a proper defense and had a conflict of interest.

With respect to an attorney's duty to investigate, the controlling law provides:

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.    In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.    In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

---

[89]    *Id.*, at pp. 98-99.

[90]    *Id.*, at p. 99.

*Newbury v. Stephens*, 756 F.3d 850, 873 (5th Cir. 2014) (quoting *Strickland v. Washington*, 466 U.S. at 690-91).    A petitioner cannot show prejudice as to a claim that his counsel failed to investigate without adducing both what the investigation would have shown and that the outcome would have been different as a result.    *Diaz v. Quarterman*, 239 F. App'x 886, 890 (5th Cir. 2007) (citing *Strickland*, 466 U.S. at 696).

Cushenberry presents only self-serving allegations in support of his contention that counsel was ineffective for failing to adequately investigate the evidence.    He presents no objective evidence at all to establish either that his counsel in fact failed to conduct a proper investigation.    Here, the record shows that counsel actively engaged in discovery and that discovery was provided to defense.[91]    Further, an Investigation Request by counsel requested that Avila, Troy Davenport, Lawrence Davenport, and Albert Earl be interviewed, but noted that Cushenberry himself indicated that some witnesses may be reluctant to speak to investigators given fears of disclosing their own drug use and other questionable behavior.[92]    Nonetheless, there is no indication that a defense investigator did not at least attempt to contact the witnesses.    In fact, Cushenberry admits that defense counsel contacted Albert Earl and that Troy Davenport gave a statement prior to trial.[93]

As for the knife, which was identified by Avila after it was found on the ground near

---

[91]    State Rec., Vol. 2 of 8, Omnibus Motion for Discovery, Motion for Suppression of Statements, Evidence and Identification; and Motions for a Preliminary Examination, 8/14/12; Inventory of Discovery Received Mandated by the Louisiana Code of Criminal Procedure, 11/5/12; State Rec., Vol. 6 of 8, Hearing Transcript, p. 2, 5/11/12.

[92]    State Rec., Vol. 3 of 8, Investigation Request, 6/5/12.

[93]    Rec. Doc. 7, p. 39; State Rec. Vol. 3 of 8, Memorandum in Support of Application, p. 17, 7/20/16; Statement of Troy Davenport, undated.

Cushenberry at the time of his arrest, there is simply no evidence that it was "planted" by Vaught or any other law enforcement officer at the scene.    In fact, Cushenberry admitted during his interview that he saw Vaught find the knife.[94]

Next, Cushenberry asserts that defense counsel was ineffective in failing to subpoena Troy Davenport, Lawrence Davenport and Albert Earl to testify at trial.

As the United States Fifth Circuit Court of Appeals has explained:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain.    For this reason, we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense.    This requirement applies to both uncalled lay and expert witnesses.

*Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets omitted); *accord Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.").    For the following reasons, Cushenberry has failed to establish ineffective assistance for failing to call these witnesses to testify under *Strickland*.

Cushenberry claims that Lawrence Davenport would have testified that Cushenberry

---

[94] State Rec., Vol. 2 of 8, Statement of Leonardo Cushenberry, p. 4, undated.

and Avila were friends and that he saw Avila borrow $20 from Cushenberry and heard Avila tell Cushenberry he would pay him back when he made change for a one hundred dollar bill. On March, 26, 2017, Davenport signed an affidavit stating the same and claiming that he would have testified at trial if called to do so.[95]    Cushenberry has not shown that Davenport's proposed testimony would have been favorable to his defense given the fact that Cushenberry admitted he punched the victim.    In fact, Davenport's proposed testimony could have been considered inculpatory in that he would have testified that Cushenberry loaned Avila the money, which would have given Cushenberry a motive to go to Avila's home, break in, hit Cushenberry, and take his money.    Given that Lawrence Davenport's testimony could have been more damaging then favorable to the defense, Cushenberry has not demonstrated his trial counsel was ineffective in failing to call him as a witness as trial.

Albert Earl also signed an affidavit on March 26, 2017, in which he stated that Avila was his former neighbor and that he knew Avila and Cushenberry to be friends.[96]    Earl further stated that he witnessed Avila inviting Cushenberry into his apartment on multiple occasions.[97]    Finally, Earl stated that he told Avila he was going to tell his landlord about the drug trafficking going on at his apartment.[98]

Defense counsel had no reason to believe that the testimony of this witness would be helpful to the defense.    Earl did not witness the events of September 16, 2011.    In fact, there is no evidence that Earl and Avila were neighbors at the time of Cushenberry's crimes.

---

[95]  State Rec., Vol. 3 of 8, Affidavit of Lawrence Davenport, 3/26/17.

[96]  State Rec., Vol. 3 of 8, Affidavit of Albert Earl, 3/26/17.

[97]  *Id.*

[98]  *Id.*

Even if Avila and Cushenberry were friends and Cushenberry had been invited into the apartment in the past, given the evidence of a forced entry, Cushenberry's admission that he struck Avila, and Earl's proposed testimony of drug trafficking at the apartment, counsel was not ineffective for failing to call Earl to testify, and Cushenberry has failed to show that there is a reasonable probability that the outcome of the trial would have been different had Earl testified.

Troy Davenport was in fact interviewed and gave a statement prior to trial. [99] Davenport stated that she, Cushenberry and "Migo" had been drinking at her house on the night "someone beat up [Avila].[100]    She stated she saw Cushenberry and Avila interacting, but admitted that she did not know what they said, and speculated that they were making plans to do something later.[101]    According to Troy Davenport, at some point, Cushenberry left, and Avila stated he needed to go home to get money and then was going to the store to buy gin.[102]    About 20-30 minutes later, she saw Avila ride past on his bike with a backpack which looked like it was full.[103]    At that time, she did not see any injuries on Avila's face.[104] Not long after, Cusheberry returned and asked her where Avila was and told her to go check on him.[105]    Troy Davenport stated when she arrived that Avila's house, he told her that

---

[99]  State Rec., Vol. 3 of 8, Statement of Troy Davenport, undated.

[100]  *Id.*, at p. 1.

[101]  *Id.*, at pp. 2-3.

[102]  *Id.*, at p. 2.

[103]  *Id.*, at p. 3.

[104]  *Id.*, at p. 3.

[105]  *Id.*

Cushenberry had kicked in the door when Avila would not let him in and then hit Avila in the jaw, and she confirmed the door had been kicked in from the outside.[106]    She admitted that Avila looked like someone had punched him in the nose and had a black eye.[107]    She stated that Avila did not tell her that Cushenberry took his money, that she did not believe Avila, and instead thought that he was scared of someone else.[108]    She claimed someone other than Cushenberry came to the Avila's house while she was there, and that Avila got up and took something from the person.[109]    She speculated that the person at the door was the person who beat up Avila and that he was giving him money for damaging the door.[110]    Troy Davenport stated that when she asked Avila why he did not call the police, he said he was going to have to call the landlord and explain the broken door.[111]    She speculated that the landlord made him call police.[112]

In an affidavit signed on March 26, 2017, Troy Davenport stated that Cushenberry asked her to check on Avila on September 16, 2011, around 10:30pm.[113]    She stated that Avila did not mention anything about Cushenberry taking his property while armed with a

---

[106]  *Id.*, at pp. 4-6.

[107]  *Id.*, at p. 5.

[108]  *Id.*, at p. 6.

[109]  *Id.*, at pp. 7-8.

[110]  *Id.*, at p. 8.

[111]  *Id.*, at pp. 8-9.

[112]  *Id.*, at p. 9.

[113]  State Rec., Vol. 3 of 8, Affidavit of Troy Davenport, 3/26/17.

knife.[114]

Cushenberry has failed to show counsel was ineffective for failing to call Troy Davenport to testify at trial or any resulting prejudice.    Troy Davenport's proposed testimony would have supported Avila's testimony that Cushenberry kicked in the door when he would not let him in and punched him in the face.    This testimony certainly would not have been exculpatory.    Many of her other statements were speculative. Additionally, Cushenberry accused Troy Davenport of smoking the crack with Avila and taking his money.[115]    Defense counsel may have had concern about calling Troy Davenport as a witness for the defense only to confront her with the accusation that she stole Avila's money.

For the foregoing reasons, Cushenberry has failed to establish there is a reasonable probability that, but for counsel's failure to call these witnesses, the outcome would have been different.    Accordingly, this claim lacks merit.

Cushenberry also claims he was denied effective assistance of counsel when counsel represented conflicting interests during trial.    He claims that counsel knew that the police had lied about the knife and there was no evidence that Cushenberry possessed it, but that counsel admitted that he had the knife to make him look culpable.    In short, Cushenberry alleges no true "conflict of interest" in the sense of counsel being divided between competing interests or loyalties that could potentially affect legal representation, such as in cases of multiple representation, or in the sense of a conflict involving the attorney's self-interest

---

[114] *Id.*

[115] State Rec, Vol. 2 of 8, Leonardo Cushenberry's Statement, p. 5, undated.

against the duty of loyalty to his client.    Instead, the claimed conflict of interest with trial counsel is obviously rooted in Cushenberry's disagreement with how counsel presented the defense.

Cushenberry believes that with a different theory of defense, that he did not possess the knife, he would have had a different, favorable outcome at trial.    However, his unsupported allegations fail to show that counsel performed deficiently or that he was prejudiced by counsels' conduct under the *Strickland* standard.

In the instant case, defense counsel was in an unenviable position.    Cushenberry gave a recorded statement to Detective Vaught during which he admitted that he hit Avila.[116] He also admitted that he told his friend "Tommy" that he punched Avila in the head.[117] Although the interview took place approximately 36 hours after the incident, Avila's hand was still swollen and painful.[118]    He claimed that Avila's door was damaged when both he and Avila fell through the door when he hit Avila.[119]    While he denied kicking in the door and possessing a knife, there was evidence of a footprint on the door and the knife was found within inches of Cushenberry when he was arrested.    In light of the overwhelming evidence in possession of the State, counsel pursued defenses that would tend to at least raise doubt as to Cushenberry's use of the knife and his theft of money.

A defendant's desire to have a specific defense theory presented does not amount to ineffective assistance of counsel on federal habeas review.    *Johnson v. Cockrell*, 301 F.3d

---

[116]  State Rec., Vol. 2 of 8, Leonardo Cushenberry's Statement, p. 4-5, undated.

[117]  *Id.*, at p. 6.

[118]  *Id.*, at pp. 5, 7.

[119]  *Id.*, at pp. 4-5, 7.

234, 239 (5th Cir.2002) (quoting *Strickland*, 466 U.S. at 689) ("[C]ourts must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' ").    Instead, "counsel has wide latitude in deciding how best to represent a client."    *Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003).

To prevail on a claim that counsel was ineffective for failing to pursue a certain defense, a petitioner must show that the defense in question was in fact a viable one. *See, e.g.*, *Otero v. Louisiana*, Civ. Action No. 12-1332, 2013 WL 6072716, at *14-15 (E.D. La. Nov. 18, 2013); *Higgins v. Cain*, Civ. Action No. 09-2632, 2010 WL 890998, at *9 n. 24 (E.D. La. Mar. 8, 2010), *aff'd*, 434 F. App'x 405 (5th Cir. 2011).

In this case, counsel actually presented a form of the defense that Cushenberry urges, that he was innocent because, while he had a knife, he took it out of his pocket and placed it on the ground when Avila began yelling at him and Avila attacked him with a sheetrock knife or saw.    While there is not a complete transcript of opening statements, defense counsel stated, "But Marco is yelling at him, cursing at him, three is a crowd.    And he is in Mr. Cushenberry's face.    Mr. Cushenberry reacts.    He pulls his self-protection knife out of his pocket."[120]    In rebuttal, the State recalled the defense's argument that Cushenberry took out a knife and put it on the ground while Migo was attacking him with a sheetrock knife.[121] During the cross-examination of Detective Rice, he admitted that, despite a photograph showing the sheetrock knife, Rice did not have it collected as evidence.[122]    Detective Vaught

---

[120]    State Rec., Vol. 6 of 8, Trial Transcript, p. 49, 11/13-14/12.

[121]    *Id.*, at p. 273.

[122]    *Id.,* at pp. 95-96.

similarly admitted that he did not have the crime lab seize the saw that was on the floor.[123] Defense counsel also asked Detective Vaught about the knife allegedly possessed by Cushenberry and he admitted that Avila did not have any injuries made by a knife.[124]

The factual determination of Cushenberry's guilt or innocence, at least as to two counts, turned largely on the credibility of the witnesses. In Cushenberry's defense, counsel attacked the credibility of the State's witnesses. As previously discussed, there is no evidence that the witnesses Cushenberry suggests would have testified in a manner beneficial to the defense. Counsel therefore cannot be deemed ineffective for relying on the State's inability to support its case and the effective defense cross-examination of the State's witnesses. This strategy was successful, to a certain extent, in that the jury found Cushenberry guilty of the lesser offense of attempted armed robbery as to count two. The fact that the defense was not successful as to the other counts, *i.e.*, that Cushenberry was convicted as charged, does not mean that counsels' actions leading to the conviction were deficient. *See Martinez v. Dretke*, 99 F. App'x 538, 543 (5th Cir. 2004) ("Again, an unsuccessful strategy does not necessarily indicate constitutionally deficient counsel."). "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689 (citations omitted). Cushenberry fails to demonstrate either prong of the *Strickland* test. His claims of conflict of interest and ineffective assistance of counsel for failing to formulate a defense have no merit.

---

[123] *Id.*, at pp. 219-21.

[124] *Id.*, pp. 215-216.

Cushenberry has not made a showing that this strategy fell below constitutional standards, or as mentioned above that the verdict would have been different had counsel pursued a different theory.    For these reasons, the state court's denial of relief on this claim was not contrary to or an unreasonable application of *Strickland*.    Cushenberry is not entitled to relief.

      *c.*    *Claim Four – Failure to Call ADA Parker to Testify*

Cushenberry claims his counsel was ineffective in failing to call ADA Parker to testify about the inconsistencies in the statement she took from Avila.[125]

When the state district court addressed this issue on post-conviction review, it found as follows:

> Defendant claims in a Supplemental Application for Post-Conviction Relief that counsel was ineffective for failing to call ADA Lisa Parker as a witness in order to question her regarding prior inconsistent statements made by the victim at the time of the incident being reported.    ADA Lisa Parker was present in Court for trial.    An issue arose as to the defense calling the ADA as a witness after defense counsel asked that she be sequestered.

> This Court reviewed all of Lisa Parker's handwritten notes, and provided to defense counsel any *Brady* evidence contained therein a week prior to trial.    Transcript p. 58.    At the time of trial, defense counsel, after argument before this Court, stipulated to the inconsistencies being clearly delineated and read to the jury.    Transcript pp. 231-256.    As stated above, this Court read the stipulated inconsistencies to the jury.

> This Court finds that this allegation fails to present deficient performance by defense counsel or prejudice to the defendant.    In fact, this Court believes that the jury was clearly apprised of the inconsistencies and considered them in their deliberations.    The jurors also heard the 911 call recording and were able to hear any additional inconsistencies in the victim's

---

[125]    Cushenberry initially framed this claim as a substantive one, that is that he was denied the right to confront Assistant District Attorney Lisa Parker who interviewed Avila.    Rec. Doc. 1, p. 10; Rec. Doc. 7, pp. 46-51.    However, in his traverse, Cushenberry clarified that his fourth claim is one of denial of effective assistance of counsel.    Rec. Doc. 18, p. 18.

reports of the incident.    This claim is therefore unfounded.[126]

The Louisiana Supreme Court found Cushenberry failed to meet the *Strickland* standard.[127]

Prior to trial, the State disclosed to the defense that Avila had contradicted his statement that he and Cushenberry were not friends and had admitted that they had smoked crack cocaine together in the past.[128]    The state district court conducted an *in camera* review of Assistant District Attorney Lisa Parker's notes taken during her initial interview with Avila and tendered to the defense those statements it believed could be considered *Brady* evidence.[129]    At trial, defense counsel objected to the state district court's denial of their request to sequester ADA Parker as a potential witness.[130]    On the second day of trial when defense counsel objected for a second time, the state district court stated it planned to read certain portions of ADA Parker's notes to the jury, and then reviewed those notes with counsel.[131]    Ultimately, counsel stipulated to three notations being read to the jury by the court.[132]

At the close of the States case, the state district court stated as follows:

> All right, ladies and gentlemen, we have one last stipulation to share with you; the parties have agreed on this.

---

[126]    State Rec., Vol. 1 of 8, State District Court Order denying post-conviction relief, p. 6, 2/8/19.

[127]    *State v. Cushenberry*, 2018–KH–0524 (La. 5/11/18), 287 So.3d 713; State Rec., Vol. 8 of 8.

[128]    *See* State Rec., Vol. 2 of 8, Motion for Disclosure of Inconsistencies in Complainant's Statements and Other Exculpatory Evidence, p. 1, 10/29/12.

[129]    State Rec., Vol. 3 of 8, Trial Transcript, pp. 58, 232, 11-13-14, 12.

[130]    *Id.*, at p. 57.

[131]    *Id.*, at pp. 232-238.

[132]    *Id.*, at pp. 255-56.

> There was an interview between Assistant District Attorney and Mr. Avila.   The following things were told by Mr. Avila to Ms. Parker, the Assistant district Attorney, I cannot swear that these things were said word for word because these are just notes.
>
> The first note is that the witness Mr. Avila told Ms. Parker, or she wrote, that he never smoked crack cocaine.    But in parenthesis she wrote, sometimes yes.
>
> The next note is that Mr. Avila had seen "him," i.e. Mr. Cushenberry at the jail on a previous occasion.
>
> The third note is that Mr. Avila informed Mr. Parker that Mr. Avila and Mr. Cushenberry did crack a couple of times together, parenthesis less than 10, parenthesis.
>
> You can take it as gospel, as they say, that those notes were in fact compiled by the Assistant District Attorney who interviewed the gentleman, and that that was her impression as to what it was that the gentleman said. Notice that none of those things are in quotes, but that was her impression and hence forth, her notes.[133]

Defense counsel made a strategic choice to enter into a stipulation to allow the state district court to read portions of ADA Parker's notes.    Cushenberry has not demonstrated that counsel was deficient or that any prejudice resulted from the stipulation being read rather than subpoenaing ADA Parker, which would have required a contradictory hearing and a finding, among other things, that "[t]here is no practicable alternative means of obtaining the information," and that her testimony would not have been repetitious.    La Code Evid. art. 507(A)(4); *State v. Ward*, 2011-KK-0438, (La. 4/25/11) (per curiam), 62 So. 2d 55 ("Although the defendant in a criminal trial has the right to prove his defense, including the calling of a prosecutor who is otherwise a competent witness, the prosecutor's testimony must be relevant and material to the theory of the defense, and it must not be privileged,

---

[133] *Id.*, at pp. 263-265.

repetitious, or cumulative.") (citation omitted).    Certainly, there was another means of obtaining the information, which was by use of Parker's notes.    Additionally, Parker's testimony would have been repetitious.

There was plenty of testimony and other evidence presented showing that Avila had given inconsistent statements about the events of September 16, 2011.    The 911 tape indicated that Avila stated that his wallet, paycheck and $300 was stolen.[134]    At the hospital, according to Officer Rice, Avila claimed that Cushenberry stole $180, but did not mention any crack cocaine.[135]    Detective Vaught similarly testified that Avila claimed Cushenberry stole $180, but that Avila never told him that he had bought $20 worth of cocaine or that he and Cushenberry had been smoking it together that night.[136]

Avila testified that he did not recall telling the 911 operator that his paycheck, wallet and $300 were stolen.[137]    He testified that he purchased two small bags of crack for $20 from a man who was with Cushenberry, and that when Cushenberry asked him to give him half, Avila declined.[138]    He admitted that he did not tell the police about the crack cocaine because he was embarrassed and ashamed.[139]    He admitted on cross-examination that he knew Cushenberry for four years and had smoked crack with him possibly five times but less

---

[134]    State Rec. Vol. 6 of 8, Trial Transcript, pp. 54, 158, 11/13-14/12.

[135]    *Id.*, at p. 96.

[136]    *Id.*, at pp. 195-96, 200-201.

[137]    *Id.*, at p. 158.

[138]    *Id.*, at pp. 129-31.

[139]    *Id.*, at pp. 142-43.

than 10 times.[140]     He claimed he did not tell Parker that he smoked crack cocaine with Cushenberry 10-12 times.[141]     He denied being friends with Cushenberry, but admitted that he was friendly towards him and had allowed him to borrow him bike in the past.[142]     Avila also admitted that he did not tell Parker that he bought cocaine but told prosecutors in a second interview.[143]

For these reasons, the state court's denial of relief on this claim was not contrary to or an unreasonable application of *Strickland*.     Cushenberry is not entitled to relief on this claim.

### d.     Ineffective Assistance of Appellate Counsel

Finally, Cushenberry claims that, due to the allegedly omitted portions of the trial transcripts, he was denied effective assistance of counsel on appeal.     He also vaguely contends that his appellate counsel was ineffective in failing to raise a *Brady* claim on appeal.

Criminal defendants are entitled to effective assistance of counsel in their first appeal of right.     *Evitts v. Lucey*, 469 U.S. 387, 394 (1985).     The *Strickland* standard also applies to claims of ineffective assistance of appellate counsel.     *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Goodwin v. Johnson*, 132 F.3d 162, 170 (5th Cir. 1997).     In reviewing claims of ineffective assistance of appellate counsel, the Supreme Court has expressly observed that appellate counsel "need not advance every argument, regardless of merit, urged by the [ ]

---

[140]  *Id.*, at pp. 150-51.

[141]  *Id.* at pp 151-152.

[142]  *Id.*, at p. 154.

[143]  *Id.*, at p. 160.

defendant." *Evitts v. Lucey*, 469 U.S. 387, 394 (1985).    When alleging ineffective assistance of appellate counsel, the defendant "must show that the neglected claim would have had a reasonable probability of success on appeal." *Duhmel v. Collins*, 955 F.2d 962, 967 (5th Cir. 1992).    However, failing to raise every meritorious claim on appeal does not make counsel deficient. *Green v. Johnson*, 116 F.3d 1115, 1125-26 (5th Cir. 1997) (citing *Ellis v. Lynaugh*, 873 F.2d 830, 840 (5th Cir. 1989) ).    Similarly, failing to raise a frivolous claim "does not cause counsel's performance to fall below an objective level of reasonableness." *Id.* at 1037.    Courts give great deference to professional appellate strategy and applaud counsel for "winnowing out weaker arguments on appeal and focusing on one central issue if possible, and at most a few key issues...." *Jones v. Barnes*, 463 U.S. 745 (1983).    This is true even where the weaker arguments have merit. *Id.* at 751–2.    Instead, the applicable test is whether the omitted issue was "clearly stronger" than the issue[s] actually presented on appeal. *See*, *e.g.*, *Diaz v. Quarterman*, 228 F. App'x 417, 427 (5th Cir. 2007); *see also Smith v. Robbins*, 528 U.S. 259, 288 (2000).

As the Court explained earlier, Cushenberry failed to provide any competent evidence that there were alterations or omissions to the trial transcripts.    As a result, Cushenberry has not met his burden to show that any claims relating to alterations or omissions to the transcripts were "clearly stronger" than the issues actually presented on appeal or that there is a reasonable probability that the appellate court would have vacated or reversed the trial court judgment if only the proposed claim had been asserted.    Therefore, this ineffective assistance of appellate counsel claim necessarily fails.

As for his claim of denial of effective assistance of appellate counsel relating to the late disclosure of evidence, appellate counsel in fact raised the issues of the denial of the requests for a mistrial.    The Louisiana Fourth Circuit, in rejecting the issues, explained:

### *The Photograph of the Door*

Mr. Cushenberry first argues that the court should have granted his motion for mistrial due to the state's untimely production of the photograph of the door, which showed that it had been reinforced by the 2x4 and that the force of entry tore the doorjamb from the walls.    On the day of trial, the defense filed a motion to exclude the photograph due to the state's late disclosure of it.    According to argument that occurred prior to voir dire, the state produced eleven photographs the day before trial, only one of which the state intended to introduce, that being the one showing the broken doorjamb with the attached 2x4 (Exhibit S–3A).    The court denied the motion, noting that while the photograph "more clearly depict[ed] the quote 'breaking' quote of a door," there was no undue prejudice or surprise because the state had produced at least four other photographs that showed the door had been broken. Counsel objected, noting that the new photo showed "something different" from "a different angle."

Later, when the defense learned of the existence of an initial police report that his counsel was not given (although prior counsel had obtained a copy of it), counsel renewed her argument concerning the photograph. Defense counsel argued that the fact that the door had been braced with a 2x4 was also listed in the initial report, but it was not in either supplemental report by Officer Rice or Detective Vaught.    At that point, the court asked counsel if she would have questioned any witness about this, and she replied that she would have questioned Officer Rice and Mr. Avila about the 2x4 on the door. The court responded that counsel knew about the 2x4 on the door prior to her cross-examination of either of these witnesses because the day before trial began she had been given the photograph.    Counsel had no reply to this, but she argued further about other information contained in the incident report, and then she requested a mistrial based upon all of the information contained in the initial report.    The court denied the motion but allowed counsel to present additional reasons to the court in camera.[6]    The defendant argues that the court erred in denying his motion for mistrial based upon the late disclosure of the photograph because the defense was unduly surprised by the 2x4's existence.    He notes that the defense theory was that he did not intend to enter Mr. Avila's apartment and only did so when he and Mr. Avila fell through the doorway when he hit Mr. Avila.    He asserts that he had been lulled into a false sense of the weakness of the state's case because had he known that the door was reinforced by the 2x4, he would have known that it was unlikely that merely falling into the door would have broken it.    He argues that "likely [trial counsel] would have attempted another theory of

defense," but he does not specify what other viable defense counsel could have put forth.

[6] In the *in camera* argument, counsel merely reiterated her argument that she would have cross-examined Mr. Avila about the 2x4, but the court again noted that counsel obtained the photo prior to cross-examination.

We do not find that the court erred by denying his motion for mistrial based on the late disclosure of the photograph. As noted by the trial court, counsel obtained the photograph prior to the beginning of trial, and, contrary to her argument, she could have cross-examined Mr. Avila and Officer Rice (who authored both the initial report and one of the supplemental reports) about the 2x4. Moreover, while only photo exhibit 3A shows the 2x4, photo exhibits 3E and 3F both show a kick mark on the bottom of the door, belying the defense's assertion that the door broke when he and Mr. Avila fell against it and supporting Mr. Avila's testimony that the defendant kicked down the door. Given all these facts, Mr. Cushenberry has not shown that the trial court abused its discretion by denying his motion for mistrial based on the late production of the photograph. This portion of this assignment of error has no merit.

*The Incident Report*

Mr. Cushenberry further argues that the trial court should have granted his motion for mistrial based upon the state's failure to produce the initial report until counsel became aware of its existence during the examination of Detective Vaught.    He contends that this report contained various pieces of information that, had counsel known about them, would have changed the defense presented to the jury.    These items, which counsel lists, are: (1) mention of the 2x4 that blocked the door through which the defendant entered Mr. Avila's apartment; (2) evidence of Mr. Avila's intoxication; (3) Mr. Avila's statement to Officer Rice that the defendant returned to the apartment after the robbery and battery, and Mr. Avila grabbed a baseball bat and chased the defendant away from the apartment; and (4) Mr. Avila's initial statement to Officer Rice about what preceded the battery and robbery, which varied in certain aspects from what he testified to at trial.    As with the late disclosure of the photograph of the door, the defendant contends that the information in the report about the 2x4 probably would have changed the defense presented at trial, given the unlikelihood that he and Mr. Avila merely fell through the door when he hit Mr. Avila. In addition, he asserts that he could have used the information about Mr. Avila's first report of the events preceding the robbery and battery to impeach his testimony, which contained inconsistencies.    Mr. Cushenberry notes that the trial court was angered that the state did not turn over this initial report earlier, and he takes exception to the court's ultimate finding that the defense was not unduly prejudiced by the very late production of this report.

The trial transcript contains pages of argument on this point, after the state produced the report during its re-direct examination of Detective Vaught and after the jury retired to deliberate.    With respect to the information about the 2x4, the court noted that the defense had received the photograph a few days before trial that depicted this.    As for the defendant's "intoxication," while the initial report listed "alcohol" under the "sobriety" heading, the court pointed out that the defense already knew that Mr. Avila had been drinking and included this fact in its opening statement.    The court noted that the information concerning the defendant's return and Mr. Avila arming himself with the baseball bat was contained in the 911 tape, a copy of which the defense had received.    As for Mr. Avila's recounting of the events that preceded the robbery and battery, the court found that the late production of this information did not unduly prejudice the defendant.    The assistant district attorney indicated that the state had produced this report to prior counsel in an earlier case, but apparently prior counsel did not give trial counsel the report.[7]    In denying the mistrial, the court further noted that other documents produced by the state should have signaled to counsel that an initial report existed.[8]

[7] The record of the prior case, number 508–975, is an exhibit to this appeal.    This report is not contained in the record.    However, trial counsel in the present case enrolled in the prior case a little over a month before the state *nolle prosequied* it.

[8] In addition, the court allowed the defense to present further reasons *in camera* why the court should grant the mistrial.    These reasons were mostly a reiteration of the argument already presented.    In addition, counsel acknowledged that she did not recall either Officer Rice or Mr. Avila to cross-examine them on the inconsistencies contained in Mr. Avila's initial reporting of the incident because she did not want the jury to believe that counsel was unprepared for trial, allowing them to draw an "unfavorable inference" toward the defendant and his counsel.    The court reiterated its denial of the motion for mistrial.

A review of the record supports the trial court's ruling because all of the information listed by appellate counsel can be found in other documents or photographs that trial counsel received prior to trial.    The 2x4 on the door can be seen in the photograph that the state produced a few days before. Evidence of Mr. Avila's intoxication was known to counsel prior to trial, and counsel apparently referred to it in her opening statement.    The allegations that the defendant returned after robbing Mr. Avila and that Mr. Avila armed himself with a baseball bat and drove him away were contained in the 911 tape, a copy of which counsel had prior to trial.    Moreover, Mr. Avila's account of the events preceding the robbery and battery, which are contained in the initial report, are almost identical to the information contained in the affidavit for the defendant's arrest warrant (a copy of which is contained in the record for case number 508–975).    Counsel listed the arrest warrant affidavit in her inventory of items that she received from the state.    Thus, counsel was apprised of this account from the affidavit for the arrest warrant. Therefore, the court properly found that the state's failure to produce to successive counsel the initial report did not unduly prejudice the defendant. The court properly denied the motion for mistrial.    This assignment of error has no merit.[144]

The Louisiana Supreme Court denied relief without reasons. [145]    Accordingly, Cushenberry's claim that his appellate counsel was ineffective should be denied.

Appellate counsel clearly raised the issues related to the late disclosure of evidence. The fact that appellate counsel was unsuccessful does not render counsel ineffective.    *See Martinez*, 99 F. App'x at 543.    The state court's denial of relief on this claims was not

---

[144] *Cushenberry*, 2013–KA–0382 (La. App. 4 Cir. 7/16/14, 146 So.3d 777, at 790-93; State Rec. Vol. 6 of 8.

[145] *Cushenberry*, 2014-KO-1765 (La. 4/2/15), 163 So. 3d 791.

contrary to or an unreasonable application of *Strickland*.    Cushenberry is not entitled to relief on this claim.

### RECOMMENDATION

**IT IS RECOMMENDED** that Cushenberry's application for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.1996) (en banc).[146]

New Orleans, Louisiana, this __1st__ day of ____February____ 2022.

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[146] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.